THE STATE EX REL. HENRY J. HORSPOOL v. GEORGE F. HAID ET AL., Judges of St. Louis Court of Appeals.—40 S. W. (2d) 611.

Division Two, July 3, 1931.

*Edward H. Robinson, A. E. L. Gardner* and *Allen, Moser & Marsalek* for relator.

*Campbell Allison, Joseph A. Falzone* and *Orval C. Sutter* for respondents.

WHITE, P. J.—Certiorari to the St. Louis Court of Appeals.

Samuel Jackson Forsythe recovered judgment against the relator, Henry J. Horspool, in the Circuit Court of the City of St. Louis for $3500. On appeal to the St. Louis Court of Appeals the judgment was affirmed. It is claimed by relator that the ruling of the Court of Appeals is in conflict with certain rulings of this court.

Forsythe was employed by Horspool as a carpenter in the construction of a dwelling house in the city of St. Louis and was injured by the collapse of a scaffold upon which he was working.

The opinion of the Court of Appeals sets out the allegations of the petition describing the manner in which the scaffold was constructed, alleging that it was made unsafe by being overloaded with shingles placed upon it by the defendant and thereby caused to fall.

The opinion then states that the answer pleaded contributory negligence in that the plaintiff himself erected the scaffold and made it unsafe.

I. The relator claims that a conflict with the rulings of this court appears on the facts stated in the opinion.

Respondents filed a supplemental abstract of the record setting out all the pleadings filed by the parties in the circuit court, together with instructions which that court gave the jury, and in their brief refer to an alleged rule that when the instructions and documents in evidence are mentioned in an opinion of the Court of Appeals sent here on certiorari they become a part of the record and must be fully examined by us. They then argue that by the same token, when the opinion sets out part of the oral testimony upon which it is claimed the conflict arises, this court in the interest of justice should examine the whole of that testimony to determine whether there is a conflict with the rulings of this court.

Logically the respondents are in an unassailable position. There is no reason why this court should examine documentary evidence referred to in the opinion of the Court of Appeals and refuse to examine oral evidence. It is all written in the record presented to that court. There is no reason, if we must examine at length an instruction referred to in the opinion of the Court of Appeals, why we should not examine the evidence upon which the trial court saw fit to give that instruction. If we are *compelled* to examine a document produced in evidence in the trial court and referred to in the opinion of the Court of Appeals there is no reason why we should not, but every reason why we should, examine any other evidence before that court which might modify the effect of that document.

A writ of certiorari is not a writ of error. Its purpose is to preserve harmony in the laws as announced by the Court of Appeals and make them consistent with the rulings of this court. We have no authority to go beyond the opinion of the Court of Appeals for that. Logically we should confine our investigation to what the opinion of the Court of Appeals contains. But if we should go outside the opinion and examine part of the record upon which that ruling was based we cannot consistently refuse to consider other parts of the record which might or might not authorize such a ruling.

While logically respondents are right, legally their position cannot be maintained. The case upon which respondents rely, State ex rel. v. Becker, 293 S. W. 783, divided 4 to 3, shows that this court, mistaking the number of decisions for the weight of authority, maintains the position that we can jump half way across a bottomless chasm and yet hope to land safe on the other side.

The opinion in the Becker case refers to State ex rel. v. Reynolds,

286 Mo. 204, where that aerial limit is drawn. The opinion in the Reynolds case, l. c. 216, says that this court "will not go beyond the opinion [of the Court of Appeals] to ascertain *the facts.*" The opinion then leaves us in doubt as to what is meant by the facts? The facts for us comprise the record before the Court of Appeals, the evidence documentary and oral, the instructions and the pleadings. Those are the facts. Then if we are limited to the opinion of the Court of Appeals to ascertain the facts we can only consider any of those things as the opinion recites them.

But the opinion in the Reynolds case then limits the rule as to the oral evidence, l. c. 217:

"The rule in the case cited [in relation to documents referred to in the opinion] has never been applied to authorize the consideration in this court, on certiorari, of testimony of witnesses upon which a Court of Appeals founds its statement of facts any further than *such testimony appears in the opinion.*" (Our italics.)

And further, l. c. 221:

"The question before the Court of Appeals then was whether the proof conclusively showed deceased was guilty of such negligence as would bar his recovery. The question before us is whether that court's ruling *that the facts it stated* did not show contributory negligence as a matter of law conflicts with controlling decisions of this court."

The opinion in the Becker case, l. c. 786, also places a limit in saying that a document referred to by the Court of Appeals does not demand our consideration unless it be the subject-matter of a ruling by that court. That is true in reviewing cases appealed from the court.

However, respondents here are not complaining of a conflict. On the contrary they assert the strict correctness of their ruling. They ask us to examine the entire record on which they placed the ruling and thus assure us that they did not sufficiently fortify their position by what they *said* in their opinion. They have misgivings that the opinion does not sustain itself. We cannot allow them thus to disparage the quality of their work. Since relator confines his complaints to the face of the opinion we must allow it to speak for itself. It states that there were certain objections to instructions, and said:

"We refer to them but it is unnecessary to set them out and unnecessarily burden this opinion."

We cannot go beyond that, as respondents demand, and examine the instructions; that would require an examination of the evidence upon which such instructions were based, because no specific instruction is pointed out, nor the purport of one stated, and, besides relator does not complain of any instruction or pleading.

II. The only points made by the relator turn upon the evidence, the question of its sufficiency to sustain a verdict. It is mentioned in the opinion, as follows:

"The evidence discloses that plaintiff received his injuries on the date mentioned in the petition. He was a carpenter, working on a building, and was engaged in placing shingles on said building. While so placing these shingles he was working upon a platform, or a scaffold, engaged at the time with another carpenter. The building was about thirty-two feet long, and the scaffold extended approximately along the entire length of the building. The scaffold was formed by putting up certain uprights, about eighteen feet high, a few feet from the building, with two in between them. The distance between the uprights was approximately ten feet. Boards, called 'lookouts,' extended from each upright to the building. On these lookouts, boards were laid to form each depth of the platform or scaffold. The uprights and lookouts were put up under the order and direction of defendant's foreman. Plaintiff and his coworker put the boards on the lookouts. The platform was made of two boards about sixteen feet in length and two inches thick, lying upon the lookouts, with a third similar board about eight feet long lying on top of the other boards in the middle space. Each sixteen-foot board extended from each end of the building to near the center of the scaffold. In the middle space the third board was put on top of the other long boards. A short time prior to plaintiff's injury he was at one end of the platform and his coworker at the other, working towards each other. While they were thus working, bundles of shingles were passed out of a window and placed upon this platform, about the middle thereof, by other employees. When plaintiff and his coworker came to the middle part of the scaffold, near where the shingles were, and with the shingles between them, the platform gave way in the middle, causing plaintiff to fall to the ground."

The opinion recites further:

"George R. Brown testified for the defendant, that he was foreman on the job when plaintiff was injured. He said that plaintiff and another workman moved the scaffold up to the upper deck, and that part of the scaffold which fell was the scaffold boards of this upper deck. He testified that the upper deck of the platform had not been properly constructed, because the boards were not nailed to the lookout. His evidence was to the effect that one of these bundles of shingles would weigh from 100 to 125 pounds.

"At the close of plaintiff's case, and at the close of the whole case, defendant requested an instruction in the nature of a demurrer to the evidence. This the court refused to give."

Then follows this statement:

"The contention is further made that plaintiff and his fellow-work-

man constructed this scaffold themselves, and, therefore, if he negligently constructed it he cannot recover. There is evidence to the effect that the platform itself was sufficient for the purpose for which it was intended. It was sufficient to hold the weight of these two men, but when some three or four extra bundles of shingles were placed thereon, not by plaintiff and his coworker, but by defendant, it was too much of a load for the scaffold to hold. There is no merit in this contention."

That the scaffold was negligently constructed, according to the evidence set out in the opinion, cannot admit of doubt. The building was thirty-two feet long; a scaffold was formed by setting uprights about eighteen feet high a few feet from the building. Boards called "lookouts" extended from those uprights to the building. Thus there were four uprights, one at each end and two between, presumably as the safest way, at equal distances, about ten feet eight inches apart, to cover the thirty-two feet. That these uprights and the lookouts by which they were attached to the building were secure we may infer, for nothing is said to the contrary. Upon these lookouts were placed boards sixteen feet long coming from each end and meeting in the middle. Each board would be supported by two lookouts resting on one at the end of the building and extending five feet or more beyond the other, to the middle where the boards met. These boards were two inches in thickness; their width is not stated. It is manifest that a sufficient weight upon the inside end of either of these boards would tend to tilt it up unless it were fastened down at the outer end at the corner of the building. Nothing is said in the opinion as to any fastening which would hold down the end to prevent that tipping up. Evidently one or both did tilt up causing the plaintiff to fall. These boards were placed there by the plaintiff and his colaborer. Upon them along the middle of that platform they placed an eight-foot plank. Necessarily it would not extend all the way to both inside lookouts which supported the 16-foot planks. The plaintiff testified that he fastened that 8-foot plank to the others by a 16-penny nail "to keep it from slipping." It is not said that these nails would have the effect to keep the other boards from tipping up, and there is nothing in the evidence to indicate that the inside board, eight feet long, slipped. Thus the scaffold was negligently constructed by failure to fasten down the ends of the 16-foot boards, or by failure to have the middle board of sufficient length to prevent that tipping up. There is no escaping the conclusion that it fell by reason of those defects. And it makes no difference whether the material was selected and the scaffold built by the plaintiff alone or in conjunction with a fellow-servant. The plaintiff was charged with the duty of building the scaffold. That was a part of his work. There is no complaint that proper and sufficient material

was not at hand to make the scaffold secure. The relator did not know and could not know how plaintiff had constructed it, or failed to make it secure, and was not responsible for that insecurity.

The opinion says a witness for the defendant testified that the platform had not been properly constructed because the boards were not properly nailed to the lookouts and that is the only reasonable inference to be drawn from the evidence for the plaintiff recited in the opinion. It was the scaffold boards which fell—not the lookouts, nor the upright. The ruling of the Court of Appeals that a case was made for the jury is in conflict with Williams v. Ransom, 234 Mo. l. c. 69; Forbes v. Dunnavant, 198 Mo. l. c. 209-211; Guthrie v. Gillespie, 319 Mo. l. c. 1148. It is said further in the opinion that bundles of shingles were placed upon the scaffold; that those shingles would weigh from 100 to 125 pounds each; that there was evidence that the platform was sufficient to hold the weight of the two men, but when three or four extra bundles of shingles were placed thereon, not by plaintiff and his coworkers but by the defendant, it was too much of a load for the scaffold to hold. This is the theory upon which the Court of Appeals reached the conclusion that the scaffold was safe enough, but was made unsafe, not by the plaintiff and his coworker, but by some other employee.

Nothing is stated in the evidence as to why those extra shingles were placed there. The reasonable inference is that they were placed there for the use of the plaintiff and his coworker, because they were standing on the scaffold nailing shingles on the roof. It is not indicated anywhere that those shingles were not necessary for their purpose. In building the scaffold for their support the plaintiff and his coworker were charged with the duty of building one that would serve their purpose under all conditions which naturally would arise. The shingles were passed out of a window while the men were at work and placed right before their eyes. No evidence is mentioned to indicate that plaintiff and his coworker didn't see them, or didn't know they were being placed there. The natural inference is that they did know the shingles would be and were passed out of the window and placed upon the platform. They must have known that the shingles would have to be placed somewhere for their use, and it is not intimated that there was any other place to put them.

The inference by the Court of Appeals that the shingles were a sufficient added load to make the boards tip up does not relieve the plaintiff of his duty to anticipate that the load would be increased in exactly the way it was, and to construct the scaffold to meet that contingency.

On the other hand the defendant, by causing the shingles needed in the work by the plaintiff to be placed out upon the platform, could not have anticipated that the scaffold was so insecure as not

to hold them up (Hunter v. Candy Co., 307 Mo. l. c. 670-671). Under the evidence recited in the opinion the conclusion is in conflict with the cases cited. It is unnecessary for us to consider other conflicts claimed by relator.

The record is quashed. All concur.